[Cite as *In re S.H.*, 2026-Ohio-2642.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
FAIRFIELD COUNTY, OHIO

| IN THE MATTER OF: S.H. | Case No. 2026 CA 00010 |
|---|---|
| | <u>Opinion And Judgment Entry</u> |
| | Appeal from the Fairfield County Court of Common Pleas, Juvenile Division, Case No. AB20230112 |
| | Judgment:  Affirmed |
| | Date of Judgment Entry: July 9, 2026 |

**BEFORE:** Andrew J. King; Robert G. Montgomery; Kevin W. Popham, Judges

**APPEARANCES:** R. KYLE WITT, Fairfield County Prosecuting Attorney by GEORGIA BYERS, for Appellee State of Ohio; ROSSIA MERANDA, Guardian ad Litem; DAVID A. TAWNEY, for Appellant Mother; and BRIAN HERZBERGER, Attorney for Father.

*Montgomery, J.*

{¶1}    Appellant Mother appeals from the judgment of the Fairfield County Court of Common Pleas, Juvenile Division, granting the Fairfield County Child Protective Services' motion for permanent custody of her two minor children – P.H. and S.H.  For the reasons below, we AFFIRM.

**STATEMENT OF THE CASE**

{¶2}    Nakia Wills, Appellant-Mother ("Mother") and Ramone McLane ("Father") are the parents of two minor children, P.H. (born 10-08-2022) and S.H. (born 08-16-2023) that are the subjects of two separate appeals, 26-09 and 26-10.[1]  Father did not contest the motion for permanent custody at the trial court level and is <u>not</u> a party to either appeal.

{¶3}    On September 18, 2023, P.H. and S.H. were placed in the temporary shelter custody of Fairfield County Child Protective Services (the "Agency").  On November 27, 2023, P.H. and S.H. were adjudicated dependent and placed in the Agency's temporary custody.  Temporary custody was extended for six months multiple times.  On March 15, 2025, the Agency filed a motion for an order of permanent custody ("PC").  The oral hearing on the motion was scheduled for August 27, 2025; however, on August 25, 2025, an Agreed Motion was filed requesting that the hearing be continued to allow the Agency to explore a kinship option.  The matter was continued, and on August 27, 2025, temporary custody was again extended for six months.  On August 29, 2025, Mother filed a motion to terminate temporary custody.

{¶4}    On November 10, 2025, a full hearing was held before a magistrate.[2] At the hearing, testimony was presented by multiple witnesses, including Mother's own testimony. The parties agreed to Stipulated Findings of Facts and to the admission of Mother's Exhibit 1 and 5.  Following the presentation of all evidence and testimony to the Court, the Guardian

---

[1] Although there are two separate case numbers on appeal, the briefs for each child were identical and reference both children.  Thus, the two appellate decisions from this Court will be identical and reference both children.

[2] The following parties were present for the hearing: Georgia Byers, Assistant Prosecuting Attorney; Krystina Hicks, Ongoing Supervisor for FCCPS; Nakia Wills, Mother; Julia Tabor, Attorney for Mother; Brian Herzberger, Attorney for Father; and Rossia Meranda, Guardian ad Litem.  Father's attorney informed the court that Father was no longer contesting the permanent custody motion and would not be attending.

ad Litem ("GAL") testified.  The GAL filed a final written report and reaffirmed her opinion at the hearing that she still supported the granting of permanent custody to the Agency.

{¶5}    After considering the testimony and evidence presented, the magistrate determined clear and convincing evidence existed to support the Agency's motion for PC and ordered the termination of Mother's parental rights for both children.  The magistrate issued detailed findings of fact and conclusions of law.  Mother filed objections to the magistrate's decision.  The trial court overruled the objections.  Mother filed the instant appeal.  In affirming the magistrate, the trial court stated:

> The Court notes that the Magistrates findings of fact are extensive and the case was Initially [sic] filed on Sept 18, 2023. The hearing on this matter was held November 10, 2025, over two years since the children were removed from the home. The testimony, findings and transcript establish a pattern of dangerous decision making by Mother. Mother had some success on her case plan but her inability to surround herself with safe places, safe people, and safe decisions outweighs any progress she made on the case plan. Mother was arrested and incarcerated December 2024, April 2025, and September 2025. Her trial on permanency where she is proving her ability to create a safe environment for her children removed for 2 years is 2 months later [after the September 2025 assault].  Mother discloses different incidences, one where she felt she was being stalked, one where a person threatened to kill her and her children, and one where she bear maced a person. One incident she explained that she felt the person she knew had a gun in the car resulting in her choices. Mother was found to have 2 men in her home with alcohol during a visit by her case worker.

One of the men disclosed that he had a firearm in the home. Mother admitted that she had been beaten by her current boyfriend and that her face was bruised as put on social media. Mother admitted to bad decision making. Mother has a pattern of blaming other people for the situations that follow her around. Mother stopped going to Children's medical appointments as she's disliked the foster mother. Mother quit her last job, leaving herself without any source of income, stating 'I then worked at a rope company in Millersport, for Smile More. And then they were not paying me good at all, and I can't do 200 bucks with two children. Sorry. So I quit." Pg 144 of transcript, lines 1-4. Mother remains unemployed at this time. Mother totaled her car two weeks prior to the permanent custody hearing.

Judgment Entry on Objections to Magistrate's Decision, at pp. 2-3.

## STATEMENT OF FACTS

{¶6} The record supports the following facts. On or about August 16, 2023, the Agency received a referral regarding Mother and the children for physical abuse, after S.H. tested positive for THC at birth. Mother reportedly had inconsistent prenatal care and tested positive at other times during the pregnancy. Due to Mother living in a shelter at the time of S.H.'s birth, the Agency created a safety plan upon release from the hospital. Mother initially agreed to the safety plan but called the Agency within a few days stating she was no longer willing to abide by it.

{¶7} On or about September 17, 2023, additional concerns were directed to the Agency regarding Mother's mental health. Mother was experiencing a mental health crisis and telling service providers that she could not take care of the children. Mother was

reportedly screaming at infant S.H. for crying and stated if S.H. rolled over and suffocated in her sleep "then so be it." The Agency also had concerns with Mother's choices and relationships. On September 18, 2023, the Agency received temporary shelter custody of the children and thereafter developed a reasonable case plan to assist Mother in remedying the issues that caused removal and attempt reunification. Mother agreed with and signed the case plan. The plan outlined specific goals and objectives, including requiring Mother to meet with the Agency on a monthly basis; submit to an assessment for mental health and alcohol and/or drug concerns and to follow all recommendations from providers; display life skills and coping strategies; participate in the children's medical appointments; participate in Early Head Start appointments; attend parenting time; demonstrate sobriety through random drug and/or alcohol screens; establish stable and consistent housing; and establish stable income.

{¶8} Regarding treatment for mental health and substance use concerns, Mother did make progress overall. Through December 2023, Mother was not consistent in attending her treatment and was minimally engaged. Mother testified she did not engage with this provider because she did not wish to talk about her parents and childhood abuse. Mother changed to a different provider in February or March of 2024. Mother's new counselor, Jackie Plunkett, testified at the hearing regarding Mother's progress. Plunkett testified that Mother is consistent with her attendance to counseling every week. Mother is diagnosed with general anxiety, depression, PTSD, ADHD, and cannabis use. Plunkett testified that she and Mother have discussed making good decisions about with whom Mother chooses to spend time. Plunkett testified that she assessed Mother based on what Mother told her but did not do independent testing.

{¶9} While Mother did engage in consistent counseling, she continued to be in concerning relationships and circumstances, including an incident where a person threatened to kill her and her children, and another when the caseworker visited Mother, she had two men in her home with alcohol on the table and one of the men disclosed he had a firearm. Mother also admitted to her boyfriend beating her and even posted photos of her bruised face on social media. The Agency testified it had issues reaching Plunkett to discuss the Agency's ongoing concerns with Mother, regarding her relationships and involvement in unsafe situations. The caseworker testified there were concerns "throughout the life of the case with intimate partner violence." Trial Tr., p. 29.

{¶10} Mother also continued to be involved in criminal activity throughout. Mother was charged and incarcerated for multiple incidents during the pending matter - December 2024 (assault in Muskingum County), April 2025, and September 2025 (assault in Fairfield County). The April 2025 charges involved felony aggravated burglary and was pending in Perry County at the time of the PC hearing. Mother also reported other concerning incidents, including a friend threatening to kill her children, an ex-boyfriend's new girlfriend stalking her, a man firing a gun at her and her friends in the woods, and Mother threatening family members with a knife and taser.

{¶11} Mother submitted to drug screens when the Agency requested. Those screens tested positive for THC, although Mother testified that she is no longer testing positive. The Agency asked Mother to regularly participate in the children's medical appointments and gave her the necessary information to attend. The Agency caseworker testified that Mother did not attend several of the medical appointments. Mother testified she attended when the children were in their first foster placement but did not continue once they were placed with

their second foster family because she did not like the foster mother. Mother participated in the Early Head Start appointments during her parenting time and was overall consistent with visitation. In April 2025, Mother's parenting time progressed to overnight and weekend visits, but it went back to supervised visits due to Mother's subsequent criminal charges and concerns regarding Mother's choice of friends.

{¶12} Regarding housing, Mother received a family reunification voucher but was not able to locate housing and utilize said voucher. She was referred two more times thereafter but did not complete the paperwork. At the time of the PC hearing, Mother had housing but was at risk of losing it. The Agency was investigating her voucher due to her criminal charges. Mother was also unemployed at the time of the hearing, with no reliable source of income for herself or her children. Prior to the hearing, she worked various jobs, including DoorDash, and she had employment at a hospital but lost it due to the criminal charges in Muskingum County. Mother testified that she quit the hospital job before they fired her.

{¶13} Regarding the GAL's recommendation to grant PC to the Agency, she testified as follows:

There's no concern that Nakia loves these girls very much. Reports from her interaction and her bond with the children, and that is evident. However, the concerns have remained with her decision-making ability and the choices she has made throughout this case, through onset. Her criminal activity, her associations, and - - she is an honest person, I will say. She has always been upfront. She has reported. I think towards the end she has retracted in her self-reporting, but she has always shared her stuff. However, the girls are too young

to self - - to report, and they are in need of that higher level of care and ability of someone to be there on a 24/7 basis for them and put their priorities, you know, ahead of, you know, their own priorities at times. So that is concerning. It has been her choices predominantly in leading up to, you know, our current court litigation.

Trial Tr., pp. 242-45.

## ASSIGNMENTS OF ERROR

{¶14} "I. THE TRIAL COURT ERRED IN DETERMINING THAT FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES EXERCISED REASONABLE EFFORTS TO REUNIFY THE MINOR CHILDREN WITH THE APPELLANT-MOTHER."

{¶15} "II. THE TRIAL COURT ERRED IN DECIDING TO PERMANENTLY END THE APPELLANT-MOTHER'S PARENTAL RIGHTS FOR THE MINOR CHILDREN."

{¶16} "III. THE TRIAL COURT ERRED IN DECIDING THAT THE CHILDREN COULD NOT BE SAFELY PLACED WITH APPELLANT-MOTHER AT THIS TIME."

{¶17} "IV. THE TRIAL COURT ERRED IN DENYING APPELLANT-MOTHER'S MOTION TO TERMINATE TEMPORARY CUSTODY."

## ANALYSIS

### 1) Reasonable Efforts by the Agency

{¶18} In the first assignment of error, Mother claims the trial court erred in finding that the Agency exercised reasonable efforts towards reunification. Pursuant to R.C. 2151.419, the agency that removed the child(ren) from the home is required to make reasonable efforts to prevent the continued removal or to make it possible for the child or children to return safely home. R.C. 2151.419(A)(1). Mother claims that the Agency failed in these efforts because it (1) failed to discuss Mother's bad decision-making with her; and (2) the foster parents hindered reunification. We disagree.

{¶19} The Agency provided case management for over two years from September 2023 through the PC hearing in November 2025. The Agency established a case plan with objectives, goals, recommendations, and referrals for providers, referred mother to screening and treatment for substance use and mental health issues, offered gas vouchers to Mother, and referred Mother to family reunification vouchers to assist with stable housing. The Agency facilitated and supervised visitation with the children, performed random drug screens to ensure compliance, and attempted to speak with Mother's counselor about addressing Mother's bad decision-making and criminal activity. Mother had criminal issues as recent as September of 2025, two months before the PC hearing, and had a pending felony criminal case from April 2025, at the time of the PC hearing.

{¶20} Regarding the foster parents, there is nothing in the record to suggest that they hindered the reunification process in any manner. Mother's bare assertion is simply insufficient. The record demonstrates that Mother had consistent visitation with her children, and the caseworker testified the foster parents understood that the Agency's goal was always reunification. Because the record overwhelmingly demonstrates the Agency exercised diligent efforts towards reunification, the trial court did not err in finding otherwise. Mother's first assignment of error is overruled.

### 2) R.C. 2151.414(B)(1)

{¶21} In the second assignment of error, Mother challenges the trial court's overall decision to terminate her parental rights. Again, Mother's argument is without merit. The "right to raise a child is an 'essential' and 'basic' civil right." *In re T.C.,* 2020-Ohio-882, ¶ 35 (5th Dist.); *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). A parent has a fundamental liberty interest in the care, custody, and management

of his or her child and an essential and basic civil right to raise his or her children. *Murray,* at 156.

**{¶22}** That right, however, is not absolute. "The natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re R.M., Jr.*, 2018-Ohio-395, ¶ 23 (5th Dist.) quoting, *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). When a court determines whether to permanently terminate parental rights, the court must grant the affected parent "every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

**{¶23}** Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so <u>and</u> that one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. *In re A.W.,* 2024-Ohio-5791, ¶ 15 (5th Dist.). The five enumerated factors are as follows:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's Parents within a reasonable time or should not be placed with the child's Parents;

(b) The child is abandoned;

(c) The child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d)      The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; * * *

(e)      The child or another child in the custody of the Parent or Parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶24} Thus, R.C. 2151.414(B)(1) establishes a two-pronged analysis that the trial court must apply when ruling on a motion for permanent custody. *In re T.J.,* 2024-Ohio-110, ¶ 14 (5th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the court must find by clear and convincing evidence "that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.* And second, the court must find by clear and convincing evidence that the grant of permanent custody is in the best interest of the child. *Id.*

{¶25} Regarding the first prong, the trial court found that R.C. 2151.414(B)(1)(d) applied. If the finding is made under 2151.414(B)(1)(a) or (d), these are "alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody." *In re Langford Children*, 2005-Ohio-2304, ¶17 (5th Dist). Indeed, S.H. and P.H. were placed in the Agency's temporary custody on September 18, 2023, and after multiple 6-month extensions of temporary custody, on March 15, 2025, the Agency filed its motion for permanent custody. Thereafter, temporary custody was <u>again</u> extended for 6 months, and the trial on the motion for PC did not occur until November 10, 2025, over two years from the initial removal date. Thus, S.H. and P.H. had been in the temporary custody of a public

children services agency for twelve or more months of a consecutive twenty-two-month period and R.C. 2151.414(B)(1)(d) clearly applies.

*R.C. 2151.414(D) - Best Interest Determination*

{¶26}  In determining the best interest of the child, R.C. 2151.414(D) mandates that the trial court consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's Parents, siblings, relatives, foster Parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the Parents and child.

{¶27}  The court must consider each factor enumerated in R.C. 2151.414(D), as well as any other relevant factors, and no one factor is given greater weight than the others. *In re Schafer,* 2006-Ohio-5513.  A juvenile court does not need to specifically list or discuss each of the best-interest factors to meet the mandate that it "consider" the factors in R.C. 2151.414(D). *A.M.*, at ¶ 42.  However, it must appear from the record that the trial court did in fact consider the factors listed as well as any other relevant factor.  *Id.* (holding that although not required, it is preferable for a juvenile court to provide some discussion or analysis of the best-interest factors to aid in appellate review and to increase confidence in its decision).

{¶28}  Importantly, the focus of the "best interest" determination is upon the child, not the parent.  Indeed, R.C. 2151.414(C) expressly prohibits the court from considering the effect a grant of permanent custody would have upon the parent. *A.W., supra*; *In re Awkal,* 85

Ohio App.3d 309 (8th Dist. 1994). Moreover, a child's best interest is generally served by the child being placed in a permanent situation that fosters growth, stability, and security. *T.C.*, at ¶ 54.

{¶29} Here, the record demonstrates that the trial court did in fact consider the best interest factors and supports the trial court's determination that granting PC is in the children's best interest. Mother clearly loves and is bonded to her children and the children are bonded to her. However, the children are likewise bonded to their foster family and their needs are being met or exceeded. The children are thriving in their current placement and have been in the home since a very young age. The children are too young to verbally express their wishes. However, the GAL provided reports and recommendations to the court in favor of granting PC. The GAL also testified at the hearing and reaffirmed her position that the children need a legally secure placement and that cannot be accomplished without granting PC to the Agency. While everyone involved in this case acknowledges Mother's bond with her children, and her progress towards some of the case plan objectives, the children need consistent and proper care that fosters growth, stability, and security.

{¶30} Caseworker Hill similarly testified the children "need somebody that's going to provide for them on a consistent basis, provide all of their medical care, and somebody that is going to be able to get them in school when they are eligible and meet their basic and safety needs." Trial Tr., p. 61. Hill further testified that Mother cannot provide this legally secure placement due to ongoing Agency concerns with Mother, including her mental health, her significant criminal activity, and her lack of ability to properly care for the children. Further, at the time of the PC hearing, Mother still had no job, she recently lost her mode of transportation, and she continued to surround herself with people who were not suitable to

be around children. Based on the evidence presented, clear and convincing evidence exists to support the trial court's finding that granting PC was in the children's best interest.

### 3) P.H. and S.H. could not be safely placed with Mother

{¶31} Mother's third assignment is a slight variance of the second assignment of error. Mother claims that the trial court erred in finding that Mother could not provide a safe place for her children. Mother asserts that she was ready to have the children home and was able to provide a legally secure placement. However, for the reasons set forth in assignment of error number two, clear and convincing evidence exists to support the finding that the children could not be placed with Mother. Although Mother made some progress on her case plan objections, including housing at the time of the PC hearing, she was at risk of losing said housing due to her criminal charges. Mother was unemployed and did not have stable income, lacked transportation, was involved in recent criminal activity, and did not demonstrate sufficient maturity to make better choices regarding her relationships and situations. Thus, Mother's third assignment of error is without merit and is overruled.

### 4) Mother's motion to terminate temporary custody

{¶32} In her fourth assignment of error, Mother argues that it was not in the children's best interest to deny her motion to terminate temporary custody to the Agency. Again, we disagree. For the reasons set forth in this opinion, it was in the children's best interest to grant PC to the Agency and terminate Mother's parental rights. Accordingly, Mother's fourth assignment of error is overruled.

## CONCLUSION

{¶33}  Mother's first, second, third, and fourth assignments of error are overruled in their entirety.  The judgment of the Fairfield County Court of Common Pleas, Juvenile Division, is AFFIRMED.

{¶34}  Costs to Appellant.


By: Montgomery, J.

King, P.J. and

Popham, J. concur.